NORTH CAROLINA

COUNTY OF MECKLENBURG

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
05-CVS-5564

BANK OF AMERICA CORPORATION and )
BANC OF AMERICA SECURITIES LLC, )
          )
    Plaintiffs, )
          )
  v. )
          )
SR INTERNATIONAL BUSINESS )
INSURANCE COMPANY, LTD and )
CERTAIN UNDERWRITERS AT )
LLOYD'S, specifically Syndicate Nos. 435, )
456, 1007, 839, 2488, and 1411,subscribing )
to Policy No. QA 626801, )
          )
    Defendants. )
          )

ORDER AND OPINION

{1} This matter is before the Court on Defendants' Motion to Compel Production of Documents from Marsh, Inc. Defendants have moved to compel Marsh, Inc. to produce e-mail correspondence from eight persons over a two-year period contained on approximately 350 to 400 backup tapes. This opinion should be read in conjunction with the opinion in *Analog Devices, Inc. v. Michalski*, 2006 NCBC 14, (N.C. Super. Ct. Nov. 1, 2006), issued contemporaneously herewith. The decision in that case deals with production of inaccessible data in the context of a party-to-party dispute and provides greater detail concerning approaches used by various courts in e-discovery disputes. Both this opinion and the opinion in *Analog* should make it clear that: (1) the language of current North Carolina Rules of Civil Procedure 26 and 45 still control trial court decisions and work well, (2) each case is different and fact intensive, (3) there exist numerous factors which might come into play in the varying factual contexts of each case, and (4) trial courts should always be cognizant that e-discovery decisions, especially those involving inaccessible data, have the potential to be outcome determinative because of the costs involved.

{2} After considering the briefs and oral arguments, The Court DENIES Defendants' motion to compel the production of deleted e-mails contained on Marsh.'s backup tapes based on the

significant burden that Marsh would undertake in complying with Defendants' request and in light of the fact that Defendants' request is premature.

*Kennedy Covington Lobdell & Hickman, LLP by George Covington; King & Spalding LLP by Dwight J. Davis, Martin M. McNerney, and Joseph R. Waala for Plaintiffs.*

*Smith Moore LLP by Larry B. Sitton, Robert R. Marsh, Jonathan P. Heyl and L. Cooper Harrell; Boies, Schiller & Flexner LLP by David Boies, Edward Normand, Christopher M. Green, and Peter A. Gwynne; Boundas, Skarzynski, Walsh & Black LLC by Alexis J. Rogoski and Maurice Pesso; for Defendants SR International Business Insurance Co., Ltd, and Kemper Indemnity Insurance Company.*

*Bradley Arant Rose & White LLP by John D. Bond, III and David Hill Bashford for Nonparty Marsh, Inc.*

Tennille, Judge.

## I.

## FACTUAL AND PROCEDURAL BACKGROUND

### A.

### THE PARTIES

{3} Plaintiff Bank of America Corporation ("Bank of America Corp.") is a corporation organized and existing under the laws of the State of Delaware. Bank of America Corp.'s principal place of business is in Charlotte, North Carolina. Plaintiff Banc of America Securities LLC is a limited liability company organized and existing under the laws of the State of Delaware. Its principal place of business is in Charlotte, North Carolina, and it is a wholly owned subsidiary of Bank of America Corp.

{4} Defendant SR International Business Insurance Co., Ltd. ("Swiss Re") is a private limited liability company organized and existing under the laws of the United Kingdom. Swiss Re is a subsidiary of Swiss Re Insurance Company, and its principal place of business is in the United Kingdom.

{5} Defendant Certain Underwriters at Lloyd's, specifically Nos. 435, 456, 1007, 839, 2488, and 1411, subscribing to Policy Number QA 626801 ("Lloyd's"), Defendant ACE Underwriting

Agencies Ltd. ("ACE) and Defendant Kemper Indemnity Insurance Company ("Kemper") provided various insurance which was in dispute in this litigation. Those matters have been resolved, and Lloyd's, ACE and Kemper are no longer parties to this suit.

{6} Marsh, Inc. ("Marsh") is an insurance and risk management advisor which acted as an insurance broker for Plaintiffs with respect to the insurance policies at issue in this litigation. Marsh is not a party.

B.

OVERVIEW

{7} This case arises out of a dispute between Plaintiff Bank of America Corp. and some of its insurers over claims made by Plaintiffs under excess liability insurance policies that were denied by Defendants.

{8} Following the collapses of Enron Corporation and WorldCom, Inc. in 2000 and 2001, several lawsuits were brought against Plaintiffs alleging that Plaintiffs' wrongful acts or omissions in the rendering of professional and investment banking services caused substantial losses to the plaintiffs in those actions. Plaintiffs herein incurred substantial losses in the defense and settlement of those actions. At the time of those actions, Plaintiffs had professional liability insurance policies which were primary, "excess" or "reinsurance" policies which had been issued by Swiss Re and others.

{9} Plaintiffs Bank of America Corp. and Banc of America Securities LLC brought suit on March 23, 2005 in Superior Court in Mecklenburg County, North Carolina against Swiss Re and Lloyd's. The original Complaint asserted claims for breach of contract for Defendants' refusal to pay Plaintiffs' defense and settlement costs incurred during litigation stemming from the Enron and WorldCom collapses ("Enron Litigation" and "WorldCom Litigation"). It also sought a declaratory judgment to establish that Plaintiffs' losses incurred in the defense and settlement of the Enron Litigation were insurable losses under the 1991 first level excess insurance policy sold by Lloyd's and that Lloyd's was obligated to pay Plaintiffs for the amount of those costs up to the policy limit. Further, it sought a declaratory judgment against all Defendants to establish Defendants' obligations under four excess insurance policies for defense and settlement costs arising out of the WorldCom Litigation.

{10} On April 20, 2005, Defendants filed a motion to have the case designated "complex business," pursuant to Rules 2.1 and 2.2 of the North Carolina General Rules of Practice for the

Superior and District Courts ("Rules of Court"), and to have it assigned to the North Carolina Business Court. On May 5, 2005, Plaintiffs filed a motion to have the case designated "exceptional," pursuant to Rule 2.1 of the Rules of Court, and to have the case assigned to a Special Superior Court Judge in Mecklenburg County. On June 17, 2005, by Order of then Chief Justice Lake, the matter was designated "complex business" and assigned to Judge Ben F. Tennille of the North Carolina Business Court.

{11} Plaintiffs filed their Amended Complaint on August 31, 2005, adding ACE Underwriting Agencies Ltd. and Kemper Indemnity Insurance Company as defendants and asserting a claim for bad faith denial of coverage against all defendants. Defendants' motion to dismiss the bad faith claim, filed on January 18, 2006, was denied on April 12, 2006.

{12} On September 14, 2005, Defendants served on Marsh a subpoena requesting the production of documents relating to the coverage dispute with Plaintiffs. After requesting and receiving additional time to serve its answers and/or objections, Marsh filed written objections to the subpoena on October 7, 2005. While negotiations between Defendants and Marsh narrowed the breadth of Defendants' requests, they were unable reach an agreement on Defendants' request that Marsh produce certain e-mails contained only in backup tapes.

{13} On February 20, 2006, Defendants filed a motion to compel Marsh to produce e-mail correspondence with Plaintiffs relating to policies brokered and placed between Plaintiffs and Defendants and other insurance carriers beginning in 2001 contained on backup tapes. Prior to oral arguments, Defendants narrowed their request to e-mails originating from eight persons over a two-year period contained on approximately 350 to 400 backup tapes. Oral arguments were held on March 30, 2006.

## C.

## NATURE OF DISCOVERY REQUESTED

{14} Defendants have requested that Marsh produce a broad range of electronically stored data relating to policies issued around the time of those policies at issue in this matter. In response to this request, Marsh produced some 50,000 documents but objected to Defendants' request that it produce the data that is the subject of this motion. At issue here is whether Marsh should be required to forensically retrieve and produce deleted e-mails contained on backup tapes.

{15} Marsh complains of the "unreasonable, oppressive and undue" burden and expense it would incur in complying with Defendants' request. Based on the affidavit of Carl Hardel, a

manager for the data recovery and electronic discovery company Kroll Ontrack, Inc., Marsh estimated, based on Defendants' original request, that the identification, restoration, extraction, conversion, and processing of e-mails on its backup tapes would cost approximately $1,395,960 to $1,400,920. (Marsh, Inc. Resp. Br. 7.) Marsh also estimated that it would incur additional expenses for work performed by its internal Expertise Technology Group (approximately $107,231), oversight by in-house counsel, and responsiveness and privilege review by outside counsel. Marsh anticipated that the requested discovery request would take approximately ten to eleven months to complete. *Id.* Since those original estimates, the breadth of the request has been reduced by approximately two-thirds to data contained on an estimated 350 to 400 backup tapes.

{16} Defendants urge that deleted e-mail correspondence contained on Marsh's backup tapes is "crucial" in demonstrating a large amount of information about insurance policies purchased by Plaintiffs from its insurers through Marsh as broker.

## II.

## ANALYSIS

{17} This matter raises many of the same concerns addressed in the Court's opinion in *Analog Devices, Inc. v. Michalski*, 2006 NCBC 14, filed contemporaneously with this opinion. *See Analog,* 2006 NCBC 14. In that opinion, the Court addressed the unique concerns raised when discovery is conducted in the electronic context. The Court sought to determine whether or how the rules of discovery should differ with electronic information. The Court looked at the various approaches federal courts have taken in attempting to apply traditional discovery rules to a world of electronic information not fully contemplated at the time those rules were adopted.

{18} While many courts have chosen to adopt multi-factor tests that attempt to bring the rules of civil procedure into a state that is more uniquely suited to electronic discovery, in *Analog* the Court opted for a straightforward application of Rule 26 of the North Carolina Rules of Civil Procedure, supplemented by Guidelines adopted by the Conference of Chief Justices. Were it necessary to adopt a separate test specifically for electronic discovery, it would not be the province of this Court to do so. It is for the appellate courts and the Legislature to set forth such a test. Similarly, in the case of discovery requested from a nonparty by a Rule 45 subpoena, as here, the Court opts for a straightforward application of the Rules of Civil Procedure, supplemented by the

Guidelines adopted by the Conference of Chief Justices.[1] Conference of Chief Justices, Guidelines for State Trial Courts Regarding Discovery of Electronically-Stored Information (2006), http://www.ncsconline.org/WC/Publications/CS_EIDiscCCJGuidelines.pdf.

{19} Rule 45 of the North Carolina Rules of Civil Procedure allows a party to a pending civil action to serve a subpoena on a nonparty with "[a] command to each person to whom it is directed to attend and give testimony or to produce and permit inspection and copying of designated records, books, papers, documents, or tangible things in the possession, custody, or control of that person therein specified." N.C. R. Civ. P. 45(a)(1)(b). Rule 45(c)(1) requires the party responsible for issuance and service of the subpoena to "take reasonable steps to avoid imposing an undue burden or expense on a person subject to the subpoena," and the rule gives the trial court authority to modify or quash the subpoena in order to enforce that provision. N.C. R. Civ. P. 45(c)(1).

{20} Rule 45(c)(3) sets forth specific grounds by which a nonparty may object to the subpoena, including that the subpoena "subjects a person to an undue burden" and that the "subpoena is otherwise unreasonable or oppressive." N.C. R. Civ. P. 45(c)(3). To the extent that it pertains to the request for deleted e-mails contained on backup tapes, Marsh has objected to the Defendants' subpoena on both of these grounds.

{21} Defendants' request that Marsh identify, restore, extract, convert, process, and search deleted e-mails from some eight authors and recipients contained on some 350 to 400 backup tapes amounts to a significant burden to place on a nonparty. Marsh is faced with not only these expenses but also the burden of having in-house counsel oversee the process and outside counsel conduct responsiveness and privilege review of the documents produced. Moreover, it is likely that Defendants already have in their possession the information that has been requested. During the relevant period, Marsh had a document retention policy in place that "required that a printed copy of every computer-generated document, including those forwarded to the client, and every substitute e-mail discussion (including those relating to instructions from and discussions with the client, underwriter, or brokering center regarding the insurance coverage or program) be maintained as part of the insurance placement file." (Fall Aff. 3.) Among the over 50,000 documents already produced by Marsh to Defendants was the insurance placement file containing printed copies of e-mail discussions that are the subject of Defendants' request. *Id.*

---

[1] Those guidelines are set out in *Analog* and attached to this opinion.

{22} Defendants have expressed concern that Marsh would presumably have only printed those e-mails that were "important to its affairs, without regard to the claims and defenses involved in this case" and that Marsh was therefore not in a position at that time to assess which documents ought to be printed under its document retention policy. (Def.s' Br. Supp. 6.) At the time of Defendants' motion, however, those concerns were premature, as Defendants had not yet determined with *any* certainty whether the documents produced failed to contain any substantive e-mail discussions regarding the policies. Defendants' motion also appears to be premature in light of Defendants' assertion at oral argument that a certain amount of additional specificity could be provided as they learn more about Marsh's responses and discussions with relation to the policies at issue.

{23} Given the significant burden that Marsh would undertake in complying with Defendants' request and in light of the fact that Defendants' request is clearly premature, the Court has determined that Defendants' motion to compel the production of deleted e-mails contained on Marsh's backup tapes should be denied.

{24} Where, as here, the request is not justified on the basis that there are specific documents not otherwise available but seeks to look at inaccessible e-mail history to see what is there, such a low level of marginal utility does not justify imposing a heavy burden on a nonparty.

{25} The Court addressed the different costs involved in obtaining inaccessible data in the *Analog* decision. Here, even though Marsh is a large company, the costs associated with this subpoena are significant. Where there has been no breach of standard retention policies and no indication of purposeful destruction of information, nonparties should not be penalized for having a backup system by making them produce inaccessible backup data without good cause.

{26} It is also significant that there exists a wealth of information from both Plaintiffs and Defendants. Marsh, as broker, was in the middle of the transaction, and there has been no showing that its correspondence and communications with either Plaintiffs or Defendants are not available in the parties' files. There has been no showing that the Marsh officials involved in brokering the policies are unavailable and no showing that their internal e-mails would show anything contrary to what their communication with the parties shows.

{27} Where, as here, the third-party subpoena imposes a burden on the third party to retrieve and recover electronically stored information which is inaccessible by its nature, there must be a high degree of marginal utility, and, even then, allocating costs to the party seeking the information would be reasonable.

{28} The Court does not find Marsh's status as a broker to compel a different result. To do so would subject independent brokers of any kind to enormous expense. If they were required to search their own inaccessible backup tapes at the request of anyone doing business with their principals, it would create a large potential expense, perhaps discouraging brokers from needed backup systems for their own use. While Marsh may or may not be an agent of Plaintiffs, for substantive law purposes, no such distinction is or should be made in the rules governing discovery. Marsh is an independent nonparty and has neither control over discovery in this litigation nor a financial stake in the outcome. It has produced reams of paper, including e-mails. It has not been accused of destroying any information intentionally, nor is there any showing it inadvertently destroyed any e-mail of significance. It corresponded with both parties to the placement of the policies at issue, and both sides should have their own records to produce to each other. There is no showing that the backup tapes which might contain internal e-mails among Marsh employees contain information not available from those employees.

{29} What the courts of this state are most likely to reject is an early and all-encompassing request to view inaccessible data stored solely for a catastrophic situation on the premise that there might be something useful and relevant in the data. Rule 45 affords greater protection to nonparties than Rule 26 provides to parties. The courts have an obligation to protect nonparties from burden and expense imposed without sufficient justification.

{30} At this stage of the proceedings, the Court's decision on this matter does not appear to be outcome determinative. There has been no showing from the thousands of documents produced by Marsh that something is missing or that there is some critical communication between Marsh employees that will affect the outcome of this case. Nor has there been any showing that the information sought is not available from current or former Marsh employees at far less expense.

{31} Ability to pay is not an issue here. The parties and Marsh all have resources to fund most searches for inaccessible data. The issue at this point is whether Marsh should be required to do so, even at the expense of Swiss Re. The Court refuses to impose such a requirement at this time. It may be that after discovery has proceeded, Swiss Re can make a strong showing that there is some particularized need to get at specific communications between Marsh employees that is otherwise not available and that has the potential to impact the outcome. The plaintiff in *Zubulake v. UBS Warburg, L.L.C.* was able to make such a showing. *See Zubulake v. UBS Warburg, L.L.C.*, 217 F.R.D. 317 (applying a balancing test to shift the cost of production of inaccessible data).

{32} In making its determination, the Court considered as significant facts in this specific case: (1) the size of the expense and the burden of production placed upon a nonparty, (2) the breadth of the information sought, (3) the availability of information from other sources, (4) the fact that the information sought was on inaccessible backup tapes, (5) the absence of any unwarranted or suspicious destruction of information, and (6) the low level of marginal utility shown at this stage of the proceedings. The Court has also considered all the factors set forth in the Guidelines adopted by the Conference of Chief Justices. *See* Conference of Chief Justices, Guidelines for State Trial Courts Regarding Discovery of Electronically-Stored Information (2006), http://www.ncsconline.org/WC/Publications/CS_EIDiscCCJGuidelines.pdf.

## III.

## CONCLUSION

{33} Based upon the foregoing, it is hereby ORDERED. ADJUDGED and DECREED that Defendants' Motion to Compel Production of Documents from Marsh, Inc. is denied.

SO ORDERED, this the 1st day of November 2006.

_____
The Honorable Ben F. Tennille
Chief Special Superior Court Judge
  for Complex Business Cases

# CONFERENCE OF CHIEF JUSTICES

## Guidelines For
## State Trial Courts Regarding Discovery
## Of Electronically-Stored Information

## Approved August 2006

### Richard Van Duizend, Reporter

# Table Of Contents

**INTRODUCTION**                                                    *v*
    Overview of Electronic Discovery                  *v*
    Purpose and Role of the Guidelines               *vi*


**PREFACE**                                                          *ix*


**GUIDELINES**                                                        *1*

1.  *Definitions*                                                     *1*
    A.    Electronically-Stored Information     *1*
    B.    Accessible Information

2.  *Responsibility of Counsel To Be Informed About Client's Electronically-Stored Information*                     *1*

3.  *Agreements by Counsel; Pre-Conference Orders*                    *2*

4.  *Initial Discovery Hearing or Conference*                         *4*

5.  *The Scope of Electronic Discovery*                               *5*

6.  *Form of Production*                                              *6*

7.  *Reallocation of Discovery Costs*                                 *7*

8.  *Inadvertent Disclosure of Privileged Information*                *8*

9.  *Preservation Orders*                                            *9*

10. *Sanctions*                                                      *10*


**BIBLIOGRAPHY**                                                     *13*

# *Introduction*[1]

## *Overview of Electronic Discovery*

Most documents today are in digital form. "Electronic (or digital) documents" refers to any information created, stored, or best utilized with computer technology of any sort, including business applications, such as word processing, databases, and spreadsheets; Internet applications, such as e-mail and the World Wide Web; devices attached to or peripheral to computers, such as printers, fax machines, pagers; web-enabled portable devices and cell phones; and media used to store computer data, such as disks, tapes, removable drives, CDs, and the like.

There are significant differences, however, between conventional documents and electronic documents—**differences in degree, kind, and costs.**

**Differences in degree.** The volume, number of locations, and data volatility of electronic documents are significantly greater than those of conventional documents.

> A floppy disk, with 1.44 megabytes, is the equivalent of 720 typewritten pages of plain text. A CD-ROM, with 650 megabytes, can hold up to 325,000 typewritten pages. One gigabyte is the equivalent of 500,000 typewritten pages. Large corporate computer networks create backup data measured in terabytes, or 1,000,000 megabytes: each terabyte represents the equivalent of 500 [m]illion typewritten pages of plain text.[2]

One paper document originating from a corporate computer network and shared with other employees who commented on it may result in well over 1,000 copies or versions of that document in the system. A company with 100 employees sending or receiving the industry average 25 e-mail messages a day produces 625,000 e-mail messages a year, generally unorganized and full of potentially embarrassing or inappropriate comments. Document search locations not only include computer hard drives, but also network servers, backup tapes, e-mail servers; outside computers, servers, and back up tapes; laptop and home computers; and personal digital assistants or other portable devices. Electronic documents are easily damaged or altered – e.g., by simply opening the file. Computer systems automatically recycle and reuse memory space, overwrite backups, change file locations, and otherwise maintain themselves automatically—with the effect of altering or destroying computer data without any human intent, intervention, or even knowledge. And, every electronic document can look like an original.

---

[1]    Much of the material in this introduction is condensed directly from a presentation on electronic discovery by Ken Withers, former Senior Judicial Education Attorney at the Federal Judicial Center, to the National Workshop for United States Magistrate Judges on June 12, 2002.

[2]    Committee on Rules of Practice and Procedures of the Judicial Conference of the United States, *Report of the Civil Rules Advisory Committee,* p.3 (Washington, DC:  August 3, 2004).

**Differences in kind.** One difference in kind between digital discovery and conventional paper discovery is that digital transactions (creation of an electronic airline ticket, for example) often create no permanent document in electronic or any other form. There are only integrated databases containing bits and pieces of millions of transactions. After a customer has printed out an e-ticket and moved to a different screen, the e-ticket "disappears." In addition, unlike conventional documents, electronic documents contain non-traditional types of data including metadata, system data, and "deleted" data. Metadata refers to the information embedded in an electronic file about that file, such as the date of creation, author, source, history, etc. System data refers to computer records regarding the computer's use, such as when a user logged on or off, the websites visited, passwords used, and documents printed or faxed. "Deleted" data is not really deleted at all. The computer has merely been told to ignore the "deleted" information and that the physical space that the data takes up on the hard drive is available for overwriting when the space is needed. The possibility that a deleted file can be restored or retrieved presents a temptation to engage in electronic discovery on a much broader scale than is usually contemplated in conventional paper discovery.

**Differences in costs.** Cost differences are often thought to include differences in the allocation of costs as well as the amount of costs. In conventional "big document" cases, for example, when responding parties simply make boxes of documents available for the requesting party to review, the costs of searching through the boxes typically fall on the requesting parties. On the other hand, the cost to the responding parties of locating, reviewing, and preparing vast digital files for production is perceived to be much greater than in conventional discovery proceedings. One reported case, for example, involved the restoration of 93 backup tapes. The process was estimated to cost $6.2 million before attorney review of the resulting files for relevance or privilege objections. Complete restoration of 200 backup tapes of one of the defendants in another prominent reported decision was estimated to cost $9.75 million, while restoration of eight randomly selected tapes to see if any relevant evidence appeared on them, could be done for $400,000.

The high costs of electronic discovery frequently include the costs of experts. Systems experts know the computers, software, and files at issue in the case. Outside experts are often brought in to conduct electronic discovery. Their role is to take the data collections, convert them into indexed and reviewable files, and ready them for production. Forensic examiners, the most expensive of all, may be brought in to search for deleted documents, missing e-mail, and system data.

On the other hand, electronic discovery can also greatly reduce the costs of discovery and facilitate the pretrial preparation process. When properly managed, electronic discovery allows a party to organize, identify, index, and even authenticate documents in a fraction of the time and at a fraction of the cost of paper discovery while virtually eliminating costs of copying and transport.

## *Purpose and Role of the Guidelines*

Until recently, electronic discovery disputes have not been a standard feature of state court litigation in most jurisdictions. However, because of the near universal reliance on electronic records both by businesses and individuals, the frequency with which electronic discovery-related ques-

tions arise in state courts is increasing rapidly, in all manner of cases. Uncertainty about how to address the differences between electronic and traditional discovery under current discovery rules and standards "exacerbates the problems. Case law is emerging, but it is not consistent and discovery disputes are rarely the subject of appellate review."[3]

Accordingly, the Conference of Chief Justices established a Working Group at its 2004 Annual Meeting to develop a reference document to assist state courts in considering issues related to electronic discovery. The initial draft of the first four Guidelines was sent to each state's chief justice in March, 2005. A Review Draft was circulated for comment in October 2005 to each Chief Justice and to a wide array of lawyer organizations and e-discovery experts. Seventeen sets of comments were received[4] and were reviewed by the Working Group in preparing the March 2006 version of the Guidelines. The Working Group wishes to express its deep appreciation to all those who took the time to share their experience, insights, and concerns.

These Guidelines are intended to help reduce this uncertainty in state court litigation by assisting trial judges faced by a dispute over e-discovery in identifying the issues and determining the decision-making factors to be applied. The Guidelines should not be treated as model rules that can simply be plugged into a state's procedural scheme. They have been crafted only to offer guidance to those faced with addressing the practical problems that the digital age has created and should be considered along with the other resources cited in the attached bibliography including the newly revised provisions on discovery in the Federal Rules of Civil Procedure[5] and the most recent edition of the American Bar Association Standards Relating to Discovery.[6]

---

[3] *Id.* at 3.

[4] From: The American College of Trial Lawyers (ACTL); The Association of Trial Lawyers of America (ATLA); Courtney Ingraffia Barton, Esq., LexisNexis® Applied Discovery; Gary M. Berne, Esq., Stoll Stoll Berne Lokting & Shlachter PC, Portland, OR; Richard C. Broussard, Esq., Broussard & David, Lafayette, LA; David Dukes, Esq., President, The Defense Research Institute (DRI); Walter L. Floyd, Esq., The Floyd Law Firm, PC, St. Louis, MO; Thomas A. Gottschalk, Executive Vice President – Law & Public Policy and General Counsel, General Motors; Robert T. Hall, Esq., Hall, Sickells, Frei and Kattenberg, PC Reston, VA; Justice Nathan L. Hecht, Supreme Court of Texas; Andrea Morano Quercia, Eastman Kodak Company; Prof. Glenn Koppel, Western State University Law School; Michelle C. S. Lange, Esq., & Charity J. Delich, Kroll Ontrack Inc.; Lawyers for Civil Justice (LCJ), U.S. Chamber Institute for Legal Reform, DRI, the Federation of Defense and Corporate Counsel, & the International Association of Defense Counsel; Charles W. Matthews, Vice President and General Counsel, Exxon Mobil; Harry Ng, American Petroleum Institute; Clifford A. Rieders, Esq., Riders, Travis, Humphrey, Harris, Waters & Waffenschmidt, Williamsport, PA.

[5] The revised rules were approved by the United States Supreme Court on April 12, 2006, and will take effect on December 1, 2006, unless Congress enacts legislation to reject, modify, or defer the amendments."

[6] American Bar Association Standards Relating to Civil Discovery, (Chicago, IL: August 2004).

Recognizing that:

- there are significant differences in the discovery of conventional paper documents and electronically stored information in terms of volume, volatility, and cost;

- until recently, electronic discovery disputes have not been a standard feature of state court litigation in most jurisdictions;

- the frequency with which electronic discovery-related questions arise in state courts is increasing rapidly, because of the near universal reliance on electronic records both by businesses and individuals; and

- uncertainty about how to address the differences between discovery of conventional and electronically-stored information under current discovery rules and standards exacerbates the length and costs of litigation; and

- discovery disputes are rarely the subject of appellate review;

the Conference of Chief Justices (CCJ) established a Working Group at its 2004 Annual Meeting to develop a reference document to assist state courts in considering issues related to electronic discovery.

A review draft of proposed Guidelines was widely circulated for comment in October, 2005. Many sets of thorough and thoughtful comments were received and discussed by the Working Group in preparing a final draft for consideration by the members of CCJ at its 2006 Annual Meeting. At its business meeting on August 2, 2006, CCJ approved the ***Guidelines for State Trial Courts Regarding Discovery of Electronically-Stored Information*** as a reference tool for state trial court judges faced by a dispute over e-discovery.

These *Guidelines* are intended to help in identifying the issues and determining the decision-making factors to be applied in the circumstances presented in a specific case. They should not be treated as model rules or universally applicable standards. They have been crafted only to offer guidance to those faced with addressing the practical problems that the digital age has created. The Conference of Chief Justices recognizes that the *Guidelines* will become part of the continuing dialogue concerning how best to ensure the fair, efficient, and effective administration of justice as technology changes. They should be considered along with the other resources such as the newly revised provisions on discovery in the Federal Rules of Civil Procedure and the most recent edition of the American Bar Association Standards Relating to Discovery. Although the *Guidelines* acknowledge the benefits of uniformity and are largely consistent with the revised Federal Rules, they also recognize that the final determination of what procedural and

evidentiary rules should govern questions in state court proceedings (such as when inadvertent disclosures waive the attorney-client privilege) are the responsibility of each state, based upon its legal tradition, experience, and process.

The *Guidelines* are being sent you to because of your interest in the civil justice process generally and electronic discovery issues in particular. Additional copies can be downloaded from the National Center for State Courts' website – www.ncsconline.org.


Conference of Chief Justices

## Guidelines For State Trial Courts Regarding Discovery Of Electronically-Stored Information

### 1. Definitions

    A.    **Electronically-stored information is any information created, stored, or best utilized with computer technology of any type.  It includes but is not limited to data; word-processing documents; spreadsheets; presentation documents; graphics; animations; images; e-mail and instant messages (including attachments); audio, video, and audiovisual recordings; voicemail stored on databases; networks; computers and computer systems; servers; archives; back-up or disaster recovery systems; discs, CD's, diskettes, drives, tapes, cartridges and other storage media; printers; the Internet; personal digital assistants; handheld wireless devices; cellular telephones; pagers; fax machines; and voicemail systems.**

    B.    **Accessible information is electronically-stored information that is easily retrievable in the ordinary course of business without undue cost and burden.**

**COMMENT:**  The definition of electronically-stored information is based on newly revised section 29 of the American Bar Association *Standards Relating to Civil Discovery* (August 2004).  It is intended to include both on-screen information and system data and metadata that may not be readily viewable.  The list included in the Guideline should be considered as illustrative rather than limiting, given the rapid changes in formats, media, devices, and systems.

The definition of accessible information is drawn pending Federal Rule 26(b)(2)(B) (2006).  *See also Zubulake v. UBS Warburg LLC*, 217 F.R.D. 390 (S.D.N.Y. 2003)*(Zubulake* III).  What constitutes an undue cost or burden will need to be determined on a case by case basis.  However, examples of information that may not be reasonably accessible in all instances include data stored on back-up tapes or legacy systems; material that has been deleted; and residual data.

### 2. Responsibility Of Counsel To Be Informed About Client's Electronically-Stored Information

**In any case in which an issue regarding the discovery of electronically-stored information is raised or is likely to be raised, a judge should, when appropriate, encourage counsel to become familiar with the operation of the party's relevant information management systems, including how information is stored and retrieved.   If a party intends to seek the production of electronically-stored information in a specific case, that fact should be communicated to opposing counsel as soon as possible and the categories or types of information to be sought should be clearly identified.**

**COMMENT:** This provision is drawn from the Electronic Discovery Guidelines issued by the U.S. District Court for the District of Kansas (para. 1) and is consistent with other rules and proposed rules that place a responsibility on counsel, when appropriate and reasonable, to learn about their client's data storage and management systems and policies at the earliest stages of litigation in order to facilitate the smooth operation of the discovery process. [See e.g., pending Federal Rules of Civil Procedure 26(f) (2006)]. While the manner in which this encouragement should be given will, of necessity, depend on the procedures and practices of a particular jurisdiction and the needs of the case before the court, the court should establish the expectation early that counsel must be well informed about their clients' electronic records. Voluntary resolution of issues involving electronically-stored information by counsel for the parties should be encouraged. Such agreements can be facilitated if the party seeking discovery clearly indicates the categories of information to be sought so that counsel for the producing party may confer with its clients about the sources of such information and render advice regarding preservation obligations.

## 3. Agreements By Counsel; Pre-Conference Orders

A. In any case in which an issue regarding the discovery of electronically-stored information is raised or is likely to be raised, a judge should encourage counsel to meet and confer in order to voluntarily come to agreement on the electronically-stored information to be disclosed, the manner of its disclosure, and a schedule that will enable discovery to be completed within the time period specified by [the Rules of Procedure or the scheduling order].

B. In any case in which an issue regarding the discovery of electronically-stored information is raised or is likely to be raised, and in which counsel have not reached agreement regarding the following matters, a judge should direct counsel to exchange information that will enable the discovery process to move forward expeditiously. The list of information subject to discovery should be tailored to the case at issue. Among the items that a judge should consider are:

(1) A list of the person(s) most knowledgeable about the relevant computer system(s) or network(s), the storage and retrieval of electronically-stored information, and the backup, archiving, retention, and routine destruction of electronically stored information, together with pertinent contact information and a brief description of each person's responsibilities;

(2) A list of the most likely custodian(s), other than the party, of relevant electronic data, together with pertinent contact information, a brief description of each custodian's responsibilities, and a description of the electronically-stored information in each custodian's possession, custody, or control;

(3) A list of each electronic system that may contain relevant electronically-stored information and each potentially relevant electronic system that was operating during the time periods relevant to the matters in dispute, together with a general description of each system;

(4)   **An indication whether relevant electronically-stored information may be of limited accessibility or duration of existence (e.g., because they are stored on media, systems, or formats no longer in use, because it is subject to destruction in the routine course of business, or because retrieval may be very costly);**

(5)   **A list of relevant electronically-stored information that has been stored off-site or off-system;**

(6)   **A description of any efforts undertaken, to date, to preserve relevant electronically-stored information, including any suspension of regular document destruction, removal of computer media with relevant information from its operational environment and placing it in secure storage for access during litigation, or the making of forensic image back-ups of such computer media;**

(7)   **The form of production preferred by the party; and**

(8)   **Notice of any known problems reasonably anticipated to arise in connection with compliance with e-discovery requests, including any limitations on search efforts considered to be burdensome or oppressive or unreasonably expensive, the need for any shifting or allocation of costs, the identification of potentially relevant data that is likely to be destroyed or altered in the normal course of operations or pursuant to the party's document retention policy.**

**COMMENT:**  This Guideline combines the approaches of the pending Federal Rules of Procedure 26(f)(3) (2006) and the rule proposed by Richard Best that relies heavily on the Default Standard for Discovery of Electronic Documents promulgated by the U.S. District Court for the District of Delaware.  The Guideline expresses a clear preference for counsel to reach an agreement on these matters.  Because not all states follow the three-step process contemplated by the Federal Rules[7] or require initial party conferences, paragraph 3(A) recommends that trial judges "encourage" counsel to meet in any case in which e-discovery is or is likely to be an issue.

When counsel fail to reach an agreement, the Guideline recommends that judges issue an order requiring the exchange of the basic informational foundation that will assist in tailoring e-discovery requests and moving the discovery process forward.  While not all of these items may be needed in every case, the list provides the elements from which a state judge can select to craft an appropriate order.

In order to address concerns regarding the Delaware Default Order expressed by defense counsel, the Guideline inserts a standard of relevance.[8]  For example, unlike the proposed California rule and the Delaware Default Standard, it requires a list of only those electronic systems

---

[7]     Step 1:  Counsel exchange basic information and become familiar with their client's information systems; Step 2: Counsel confer to attempt to resolve key discovery issues and develop a discovery plan; and Step 3: A hearing and order to memorialize the plan and determine unsettled issues.

[8]     Relevance in this context refers to a state's standard of relevance for discovery purposes, not the standard used to determine admissibility at trial.

on which relevant electronically-stored information may be stored or that were operating during the time periods relevant to the matters in dispute, rather than the broader "each relevant electronic system that has been in place at all relevant times." It is hoped that in this way, the burden on the responding party may be reduced by being able to focus solely on the systems housing the actual electronically-stored information or data that is or will be requested. Of course, the best way of limiting the burden is for counsel to agree in advance, thus obviating the need to issue a pre-conference order.

Subparagraph 2(B)(3) suggests that the parties be required to provide a general description of each electronic system that may contain relevant electronically-stored information. Ordinarily, such descriptions should include the hardware and software used by each system, and the scope, character, organization, and formats each system employs.

Subparagraph 2(B)(7) of the Guideline includes one issue not covered in the proposed California rule or Delaware Default Standard -- the form of production preferred by the party. [See the pending *Federal Rules of Civil Procedure* 26(f)(3) (2006).] Including an exchange of the format preferences early will help to reduce subsequent disputes over this thorny issue.

## 4. *Initial Discovery Hearing Or Conference*

**Following the exchange of the information specified in Guideline 3, or a specially set hearing, or a mandatory conference early in the discovery period, a judge should inquire whether counsel have reached agreement on any of the following matters and address any disputes regarding these or other electronic discovery issues:**

  A. **The electronically-stored information to be exchanged including information that is not readily accessible;**

  B. **The form of production;**

  C. **The steps the parties will take to segregate and preserve relevant electronically stored information;**

  D. **The procedures to be used if privileged electronically-stored information is inadvertently disclosed; and**

  E. **The allocation of costs.**

COMMENT: This Guideline is derived from Electronic Discovery Guidelines issued by the U.S. District Court for the District of Kansas. It addresses the next stage of the process, and lists for the trial judge some of the key issues regarding electronic discovery that the judge may be called upon to address. The intent is to identify early the discovery issues that are in dispute so that they can be addressed promptly.

## 5.   *The Scope Of Electronic Discovery*

In deciding a motion to protect electronically-stored information or to compel discovery of such information, a judge should first determine whether the material sought is subject to production under the applicable standard for discovery.  If the requested information is subject to production, a judge should then weigh the benefits to the requesting party against the burden and expense of the discovery for the responding party, considering such factors as:

A.   The ease of accessing the requested information;

B.   The total cost of production compared to the amount in controversy;

C.   The materiality of the information to the requesting party;

D.   The availability of the information from other sources;

E.   The complexity of the case and the importance of the issues addressed;

F.   The need to protect privileged, proprietary, or confidential information, including trade secrets;

G.   Whether the information or software needed to access the requested information is proprietary or constitutes confidential business information;

H.   The breadth of the request, including whether a subset (e.g., by date, author, recipient, or through use of a key-term search or other selection criteria) or representative sample of the contested electronically stored information can be provided initially to determine whether production of additional such information is warranted;

I.   The relative ability of each party to control costs and its incentive to do so;

J.   The resources of each party compared to the total cost of production;

K.   Whether the requesting party has offered to pay some or all of the costs of identifying, reviewing, and producing the information;

L.   Whether the electronically-stored information is stored in a way that makes it more costly or burdensome to access than is reasonably warranted by legitimate personal, business, or other non-litigation-related reasons; and

M.   Whether the responding party has deleted, discarded, or erased electronic information after litigation was commenced or after the responding party was aware that litigation was probable.

**COMMENT:** This Guideline recommends that when a request to discover electronically-stored information is contested, judges should first assess whether the information being sought is subject to discovery under the applicable state code, rules, and decisions (e.g., whether the material sought is relevant to the claims and defenses of the party, or relevant to the subject matter under dispute, or could lead to admissible evidence). Once this question has been answered, the Guideline suggests that judges balance the benefits and burdens of requiring discovery, offering a set of factors to consider derived from the revised American Bar Association *Standards Relating to Civil Discovery,* Standard 29.b.iv. (August 2004). In so doing, it sets out a framework for decision-making rather than specific presumptions regarding "reasonably accessible" vs. "not reasonably accessible" data; active data vs. "deleted" information; information visible on-screen vs. meta-data; or forensic vs. standard data collection. *But see e.g.,* Pending Federal Rule of Civil Procedure 26(b)(2)(2006); The Sedona Conference Working Group on Best Practices for Electronic Document Retention and Production, *The Sedona Principles,* Principles 8, 9, and 12 (Silver Spring, MD: The Sedona Conference 2004). It is unlikely that all of the factors will apply in a particular case, though the first six will arise in most disputes over the scope of electronically stored information. *See e.g., Public Relations Society of America, Inc. v. Road Runner High Speed Online,* 2005 WL 1330514 (N.Y. May 27, 2005).

Depending on the circumstances and the decision regarding the scope of discovery, the judge may wish to consider shifting some or all of the costs of production and review in accordance with the factors cited in Guideline 7, *infra.*

## 6. *Form Of Production*

**In the absence of agreement among the parties, a judge should ordinarily require electronically-stored information to be produced in no more than one format and should select the form of production in which the information is ordinarily maintained or in a form that is reasonably usable.**

**COMMENT:** In conventional discovery, the form of production was seldom disputed. In electronic discovery, there are many choices besides paper. While a party could produce hard-copy printouts of all electronic files, doing so would likely hide metadata, embedded edits, and other non-screen information. It also would be voluminous and cumbersome to store, and costly to produce and search. On the other hand, producing all data in "native format" (i.e. streams of electrons on disks or tapes exactly as they might be found on the producing party's computer) would provide all the "hidden" data and be more easily stored, but would be just as difficult to search without the word-processing, e-mail, or database software needed to organize and present the information in a coherent form.

This Guideline is based on pending Federal Rule of Civil Procedure 34(b)(ii) and (iii) (2006). It recommends that parties should not be required to produce electronically-stored information in multiple formats absent a good reason for doing so. See also comment 12.c of *The Sedona Principles.* [The Sedona Conference Working Group on Best Practices for Electronic Document Retention and Production, *The Sedona Principles* (Silver Spring, MD: The Sedona Conference 2004).] Requests for multiple formats should be subject to the same cost-benefit analysis as suggested in Guideline 5.

The Guideline, like the pending Federal Rule, suggests rendition in the form in which the information is ordinarily maintained or in another form that is reasonably useable. The Guideline, thus, assumes that the information's standard format is reasonably usable or it would be of no benefit to the party who has produced it, but allows substitution of another format that may still be helpful to the requesting party. Whether the production of metadata and other forms of hidden information, are discoverable should be determined based upon the particular circumstances of the case.

## 7.  *Reallocation of Discovery Costs*

**Ordinarily, the shifting of the costs of discovery to the requesting party or the sharing of those costs between the requesting and responding party should be considered only when the electronically-stored information sought is not accessible information and when restoration and production of responsive electronically-stored information from a small sample of the requested electronically-stored information would not be sufficient. When these conditions are present, the judge should consider the following factors in determining whether any or all discovery costs should be borne by the requesting party:**

A.  **The extent to which the request is specifically tailored to discover relevant information;**

B.  **The availability of such information from other sources;**

C.  **The total cost of production compared to the amount in controversy;**

D.  **The total cost of production compared to the resources available to each party;**

E.  **The relative ability of each party to control costs and its incentive to do so;**

F.  **The importance of the issues at stake in the litigation; and**

G.  **The relative benefits of obtaining the information.**

**COMMENT:** This Guideline reflects the analysis conducted in *Zubulake v. UBS Warburg LLC, 216 F.R.D. 280 (S.D.N.Y. 2003)(Zubulake* III), the leading federal case on the issue. The Court in *Zubulake* established a three-tiered test for determining when it is appropriate to require a requesting party to pay or contribute to the cost of producing discoverable material. The first tier is a determination of whether the electronically-stored information is accessible. The second tier is a determination that a less-costly method of obtaining the needed information such as restoration of a representative sample of the tapes, disks, or other storage media would not be feasible. The final step is a cost-benefit analysis similar to that recommended in Guideline 5 for determining the appropriate scope of discovery.

The *Zubulake* litigation involved a sex discrimination complaint in which the plaintiff requested e-mail messages beyond the approximately 100 pages produced by the defendants.

"She presented substantial evidence that more responsive e-mail existed, most likely on backup tapes and optical storage media created and maintained to meet SEC records retention requirements. The defendants objected to producing e-mail from these sources, which they estimated would cost $175,000 exclusive of attorney review time." Withers, K.J., *Annotated Case Law and Further Reading on Electronic Discovery* 17 (June 16, 2004).

The Court found the requested material to be relevant and ordered restoration of 5 of the total of 77 back-up tapes at a cost of approximately $19,000. After determining that 600 of the restored messages were responsive to the plaintiff's discovery request, the Court ordered restoration of the remaining tapes at an estimated cost of $165,954.67 for restoration and another $107,695 for review, requiring the plaintiff to bear 25% and the defendants 75% of the costs of restoration and the defendants to pay 100% of the costs of reviewing the material for privileged information. *Id.,* 30.

Like Zubulake, the Guideline treats cost-shifting as a matter for the judge's discretion. (*But see* Texas Rule of Civil Procedure 196.4 which requires that whenever a court orders a responding party to produce information that is not 'reasonably available," the court must require the requesting party to pay "the reasonable expenses of any extraordinary steps required to retrieve and produce the information.") It anticipates that the proposed cost/benefit analysis will both encourage requesting parties to carefully assess whether all the information sought is worth paying for, while discouraging the producing party from storing the information in such a way as to make it extraordinarily costly to retrieve.

## 8. *Inadvertent Disclosure of Privileged Information*

**In determining whether a party has waived the attorney-client privilege because of an inadvertent disclosure of attorney work-product or other privileged electronically stored information, a judge should consider:**

A. **The total volume of information produced by the responding party;**

B. **The amount of privileged information disclosed;**

C. **The reasonableness of the precautions taken to prevent inadvertent disclosure of privileged information;**

D. **The promptness of the actions taken to notify the receiving party and otherwise remedy the error; and**

E. **The reasonable expectations and agreements of counsel.**

COMMENT: Inadvertent disclosure of privileged information is sometimes unavoidable because of the large amounts of information that are often involved in electronic discovery, and the time and cost required to screen this voluminous material for attorney work product and other privileged materials. As indicated in Guideline 4, the best practice is for the parties to agree on

the process to use if privileged information is inadvertently disclosed and that such a disclosure shall not be considered a waiver of attorney-client privilege. While "claw-back" or "quick peek" agreements[9] are not perfect protections against use of privileged information by third parties not subject to the agreement or by the receiving party in another jurisdiction, they do allow the litigation to move forward and offer significant protection in many cases, especially when coupled with a court order recognizing the agreement and declaring that inadvertent production of privileged information does not create an express or implied waiver. [*See* The Sedona Conference Working Group on Best Practices for Electronic Document Retention and Production, *The Sedona Principles*, Comment 10.d (Silver Spring, MD: The Sedona Conference 2004); and Report of the Judicial Conference Committee on Practice and Procedure, pp 33-34 (September 2005).]

This Guideline applies when the parties have not reached an agreement regarding the inadvertent disclosure of electronically stored information subject to the attorney-client privilege. The first four factors are based on *Alldread v. City of Grenada*, 988 F.2d, 1425, 1433, 1434 (5th Cir. 1993). [*See also United States v. Rigas*, 281 F. Supp. 2d 733 (S.D.N.Y. 2003). The fifth factor listed by the Court in *Alldread* – "the overriding issue of fairness" – is omitted, since the four factors listed help to define what is fair in the circumstances surrounding a disclosure in a particular case, but the reasonable expectations and agreements of counsel has been added to reinforce the importance of attorneys discussing and reaching at least an informal understanding on how to handle inadvertent disclosures of privileged information.

Unlike Texas Rule of Civil Procedure 193.3(d) and the most recent revisions to Federal Rule of Civil Procedure 26(b)(5)(B), the Guideline does not create a presumption against a waiver when, within 10 days after discovering that privileged material has been disclosed, "the producing party amends the response, identifying the material or information produced and stating the privilege asserted." While the Texas rule has apparently worked well, creation of a presumption is a matter for state rules committees or legislatures and goes beyond the scope of these Guidelines.

## 9. *Preservation Orders*

A. **When an order to preserve electronically-stored information is sought, a judge should require a threshold showing that the continuing existence and integrity of the information is threatened. Following such a showing, the judge should consider the following factors in determining the nature and scope of any order:**

(1) **The nature of the threat to the continuing existence or integrity of the electronically-stored information;**

(2) **The potential for irreparable harm to the requesting party absent a preservation order;**

---

[9] Claw-back agreements are a formal understanding between the parties that production of privileged information is presumed to be inadvertent and does not waive the privilege and the receiving party must return the privileged material until the question is resolved. Under "quick peek" agreements, counsel are allowed to see each other's entire data collection before production and designate those items which they believe are responsive to the discovery requests. The producing party then reviews the presumably much smaller universe of files for privilege, and produces those that are responsive and not privileged, along with a privilege log. K.J., Withers, "Discovery Disputes: Decisional Guidance," 3 Civil Action No. 2, 4,5 (2004).

    (3)    **The capability of the responding party to maintain the information sought in its original form, condition, and content; and**

    (4)    **The physical, technological, and financial burdens created by ordering preservation of the information.**

B.    **When issuing an order to preserve electronically stored information, a judge should carefully tailor the order so that it is no broader than necessary to safeguard the information in question.**

**COMMENT:** One consequence of the expansion in the volume of electronically-stored information resulting from the use of computer systems, is the reliance on automated data retention programs and protocols that result in the periodic destruction of defined types of files, data, and back-up tapes. These programs and protocols are essential for smooth operation, effectively managing record storage, and controlling costs. The factors for determining when to issue a preservation order apply after existence of a threat to the sought information has been demonstrated. They are drawn from the decision in *Capricorn Power Co. v. Siemens Westinghouse Power Corp.*, 220 F.R.D. 429 (W.D. Pa. 2004). They require balancing the danger to the electronically stored information against its materiality, the ability to maintain it, and the costs and burdens of doing so.

Because electronically-stored information, files, and records are seldom created and stored with future litigation in mind, they cannot always be easily segregated. An order directing a business to "halt all operations that can result in the destruction or alteration of computer data, including e-mail, word-processing, databases, and financial information . . . can effectively unplug a computer network and put a computer dependent company out of business." K.J. Withers, "Electronic Discovery Disputes: Decisional Guidance," 3 *Civil Action* No. 2, p.4 (NCSC 2004). Thus, the Guideline urges that when a preservation order is called for, it should be drawn as narrowly as possible to accomplish its purpose so as to limit the impact on the responding party's operations.

## 10.  *Sanctions*

Absent exceptional circumstances, a judge should impose sanctions because of the destruction of electronically-stored information only if:

A.    **There was a legal obligation to preserve the information at the time it was destroyed;**

B.    **The destruction of the material was not the result of the routine, good faith operation of an electronic information system; and**

C.    **The destroyed information was subject to production under the applicable state standard for discovery.**

**COMMENT:** This Guideline closely tracks pending Federal Rule of Civil Procedure 37(f) (2006), but provides greater guidance to courts and litigants without setting forth the stringent standards suggested in the *Sedona Principles* ["a clear duty to preserve," "intentional or reckless failure to preserve and produce," and a "reasonable probability" of material prejudice]. [The Sedona Conference Working Group on Best Practices for Electronic Document Retention and Production, *The Sedona Principles*, Principle 14 (Silver Spring, MD: The Sedona Conference 2004).]

# Selected Bibliography On Discovery Of Electronically-Stored Information

## RULES AND STANDARDS[10]

ABA Section of Litigation. *ABA Civil Discovery Standards.* Revised August 2004.

Ad Hoc Committee for Electronic Discovery of the U.S. District Court for the District of Delaware. *Default Standard for Discovery of Electronic Documents "E-Discovery"* (May 2004).

Committee on Rules of Practice and Procedures of the Judicial Conference of the United States. Report (September 2005).

District of Delaware. *Default Standard for Discovery of Electronic Documents (*May 2004).

U.S. District Court for the District of Kansas. *Electronic Discovery Guidelines* (March 2004).

*Local and Civil Rules of the U.S. District Court for the District of New Jersey,* R. 26.1(d), Discovery of Digital Information Including Computer-Based Information.

*Mississippi Rules of Civil Procedure,* Rule 26(b)(5), 2003.

Sedona Conference Working Group on Best Practices for Electronic Document Retention and Production. *The Sedona Principles: Best Practices Recommendations and Principles for Addressing Electronic Document Production.* Sedona, AZ: Sedona Conference Working Group Series, January 2004. Updated version.

*Texas Rules of Civil Procedure.* 193.3(d) and 196.4 (1999).

## ARTICLES

Allman, Thomas Y. "A Proposed Model for State Rules re: Electronic Discovery." National Center for State Courts, November 15, 2001.

Best, Richard E. "Taming the Discovery Monster." *California Litigation: The Journal of the Litigation Section, State Bar of California* (November, 2005).

Best, Richard E. "E-Discovery Basics." *California Litigation: The Journal of the Litigation Section, State Bar of California* (August 2005).

Best, Richard E. "The Need for Electronic Discovery Rules." *Modern Practice* (August 2002).

---

[10] The following additional federal jurisdictions have codified the practice of electronic discovery: Eastern and Western Districts of Arkansas [Rule 26.1(4) (2000)]; Middle District of Pennsylvania [Rule 26.1 (2005)]; Wyoming [Rule 26.1(d)(3)(B).

Bobelian, Michael. "N.Y. Judge Charts a Course on Electronic Discovery; Finding No Exact Precedent, Nassau Justice Applies Rule that Requesting Side Pays." *New York Law Journal* (August 24, 2004).

Carroll, John L. and Withers, Kenneth J. Observations on "The Sedona Principles," 2003 (www.kenwithers.com).

Hedges, Ronald J.  Discovery of Digital Information, 2004 (www.kenwithers.com).

Johnson, Molly Treadway, Kenneth J. Withers, and Meghan A. Dunn, "A Qualitative Study of Issues Raised by the Discovery of Computer-Based Information in Civil Litigation." Submitted to the Judicial Conference Advisory Committee on Civil Rules for its October 2002 meeting, Federal Judicial Center, Washington, D.C., September 13, 2002 (www.kenwithers.com).

Joseph, Gregory P. "Electronic Discovery Standards". November 2003 (www.kenwithers.com).

Joseph, Gregory P. "Electronic Discovery." *National Law Journal* (October 4, 2004): 12.

Redgrave, Jonathan M., and Erica J. Bachmann. "Ripples on the Shores of Zubulake: Practice Considerations from Recent Electronic Discovery Decisions." *Federal Lawyer* (November/December 2003): 31.

Solovy, Jerold S., and Robert L. Byman. "Cost-Shifting." *National Law Journal* (November 10, 2003): 23.

Van Duizend, Richard. "Electronic Discovery: Questions and Answers." *Civil Action* 3, no. 2 (2004): 4.

Withers, Kenneth J. "Electronic Discovery Disputes:  Decisional Guidance", *Civil Action* 3 no. 2, (2004): 4.

Withers, Kenneth J. Annotated Case Law and Further Reading on Electronic Discovery, June 16, 2004 (www.kenwithers.com).

Withers, Kenneth J. "Two Tiers and a Safe Harbor: Federal Rulemakers Grapple with E-Discovery," August 23, 2004 (www.kenwithers.com).

Withers, Kenneth J. Is *Digital Different? Electronic Disclosure and Discovery in Civil Litigation.* Washington, DC: Federal Judicial Center, 2001.