Blythe v. Bell, 2012 NCBC 42.

STATE OF NORTH CAROLINA

COUNTY OF CATAWBA

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
11 CVS 933

WILLIAM A. B. BLYTHE
(individually and in his capacity as
shareholder) and DRYMAX SPORTS,
LLC,

        Plaintiffs,

     v.

ROBERT E. BELL III, VIRGINIA
BELL, NISSAN JOSEPH and
HICKORY BRANDS, INC.,

        Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

**ORDER ON MOTION FOR ORDER
COMPELLING RETURN OF
PRIVILEGED DOCUMENTS**

{1} THIS MATTER is before the court on Defendants' Motion for Order Compelling Return of Privileged Documents ("Motion") pursuant to Rule 26(b)(7) of the North Carolina Rules of Civil Procedure ("Rule(s)"). For the reasons stated below, the Motion is DENIED.

*Moore & Van Allen, PLLC by James P. McLoughlin, Jr., Mark A. Nebrig, Benjamin P. Fryer, Frank E. Schall, and Christopher D. Tomlinson, for Plaintiffs William A. B. Blythe and Drymax Sports, LLC.*

*Ellis & Winters, LLP by Andrew S. Chamberlin and C. Scott Meyers and Young, Morphis, Bach & Taylor, LLP by Paul E. Culpepper and Kevin C. McIntosh for Defendants Robert E. Bell, III, Virginia Bell, Nissan Joseph, and Hickory Brands, Inc.*

Gale, Judge.

## I. PROCEDURAL HISTORY

{2} Plaintiffs William A.B. Blythe ("Blythe") and Drymax Sports, LLC ("Drymax") filed their Complaint in Catawba County Superior Court on March 22, 2011, and their Amended Complaint on July 28, 2011, asserting numerous causes of

action arising out of disputes over the internal governance and control of Drymax. On September 26, 2011, Defendants Robert E. Bell, III ("R. Bell"), Virginia Bell ("V. Bell"), Nissan Joseph ("Joseph"), and Hickory Brands, Inc. ("HBI") filed their Motion to Dismiss and Answer.

{3} Plaintiffs filed a document request on March 29, 2011 to which Defendants had not responded when Plaintiffs filed a motion to compel on November 7, 2011, which led to the November 28, 2011 entry by the presiding Catawba County Superior Court Judge of a stipulation requiring Defendants to produce certain documents on or before January 3, 2012. Defendants have produced two hard drives pursuant to that stipulation, which production leads to the present Motion.

{4} On March 9, 2012, Defendants filed their Motion for Leave to Amend Answer and Assert Counterclaims ("Motion to Amend") and their Motion to Appoint Receiver. Based on issues raised in the March 9, 2012 filings, Plaintiffs sought designation of the action as a mandatory complex business case pursuant to N.C. Gen. Stat. § 7A-45.4 and Business Court Rule 3.1(b). The matter was designated by Chief Justice Sarah Parker subject to the amendment. Chief Business Court Judge John R. Jolly, Jr. granted the Motion to Amend on April 23, 2012 and assigned the case to the undersigned. Defendants filed the present Motion on April 24, 2012.

{5} The Motion has been fully briefed, the court heard oral arguments, and the matter is ripe for disposition.


## II.  FACTS

{6} The court makes the following findings solely to resolve the present Motion and reserves reconsideration of those same facts as may be necessary or appropriate later to resolve the merits of the various claims in subsequent proceedings.

{7} Drymax is a North Carolina limited liability company with a principal place of business in Catawba County, North Carolina. Drymax designs and sells an extensive line of athletic, casual, and business socks and insoles.

{8} Blythe is a citizen and resident of the State of California who has been a Drymax member since its creation on November 6, 2003. Blythe is Drymax's President and sole duly elected Managing Member.

{9} HBI is a North Carolina corporation with a principal place of business in Catawba County, North Carolina. HBI is a manufacturer, wholesaler, and supplier of foot care and footwear accessories, including laces, insoles, cording, and lanyards. HBI has a number of affiliate and subsidiary companies which produce, market, and supply similar foot care and footwear accessories.

{10} R. Bell is a citizen and resident of the State of North Carolina, a Drymax member, an HBI controlling owner and officer, and a controlling owner and officer of Strabell, LLC, a Drymax affiliate.

{11} V. Bell is a citizen and resident of the State of South Carolina, an HBI owner and officer, and a Strabell, LLC officer.

{12} Joseph is a citizen and resident of the State of North Carolina, and was a Drymax member until January 2008, and HBI's President and Chief Executive Officer from May 2003 until January 2008.

{13} Plaintiffs served Defendants with their First Requests for Production of Documents ("Document Requests") on March 29, 2011,[1] and filed a motion to compel in Catawba County Superior Court on November 7, 2011.[2] On November 28, 2011, the court entered a Stipulation and Order ("Stipulation") requiring Defendants on or before January 3, 2012 to produce "[e]mail between and among HBI's officers and

---

[1] Defendants assert that they "have responded to 212 document requests, have produced approximately 2,000 pages of documents directly responsive to those requests, have produced over 10,000 pages of e-mails with attachments, and have given Plaintiffs access to their stored documents consisting of approximately 300 boxes of documents." (Defs.' Mot. ¶ 3.) Plaintiffs do not now complain that Defendants have produced too little. To the contrary, while they contend that Defendants made no production until several months after they were required to because of Plaintiffs' motion to compel, Plaintiffs accuse Defendants of a "document dump," combining irrelevant documents along with those requested.

[2] Plaintiffs assert that the November 7, 2011 motion to compel followed Defendants' admitted failure to conduct a comprehensive search of HBI's e-mail database and what Plaintiffs characterize as Defendants' persistent failure during the preceding seven (7) month period to respond adequately to discovery requests. (Pls.' Resp. Opposing Defs.' Mot. for Order Compelling Return of Privileged Documents ("Pls.' Resp. Br.") 2.)

employees, Drymax product sales representatives, Drymax product manufacturers, retailers and others that are responsive to document requests." (Defs.' Mot. for Order Compelling Return of Privileged Docs. ("Defs.' Mot.") Ex. A.) There was at that time no case scheduling order and no protective order or other agreement providing for procedures to be followed in the event of an inadvertent production of privileged information.

{14} HBI contracted with Computer Ants, based in Hickory, North Carolina, owned and operated by Thomas D. Scott ("Scott"), to obtain, process, and search HBI's e-mails for responsive documents. Computer Ants was to locate PST files and convert them into readable PDF format. (Defs.' Mot. ¶ 7.)

{15} Plaintiffs, in part, question whether Computer Ants was sufficiently qualified as an expert in electronic discovery to reasonably justify Defendants' reliance on it to protect against the production of privileged information. Scott testified that prior to being engaged by HBI, he had never provided any forensic computer services in the context of a lawsuit (Dep. of Thomas D. Scott ("Scott Dep.") 13:24–14:3), had never been engaged as a computer expert or provided an opinion in any legal proceeding (Scott Dep. 67:10–12; 68:17–21), and had litigation-related experience limited to domestic cases where he had been asked to examine computer and phone records to support domestic claims. (Scott Dep. 68:6–9.) Scott had varied employment experience outside the computer field prior to establishing Computer Ants, including work as a truck driver, a Bass Pro Shop Security Manager, a respiratory therapist, and a financial auditor for a retail seller. (Scott Dep. 14:23–15:18.)

{16} By letter dated November 17, 2011, Plaintiffs' counsel provided Defense counsel with a list of more than thirty-five potential search terms to be used in searching Defendants' computer files. Plaintiffs' letter also stated that "providing this list of search terms is in no way intended to transfer the defendants' discovery obligation to the plaintiffs. This list may be both over-inclusive and under-inclusive in that it may yield non-responsive documents and may not yield otherwise

responsive documents." (Pls.' Resp. Br. 3.) The record suggests that Defendants directed Computer Ants to use Plaintiffs' search terms without modification.

{17} Computer Ants obtained copies of HBI e-mail files stored on thirty-five computers, six servers, and three hard drives, yielding approximately 286 gigabytes of information which consisted of 547 PST files and contained 307,816,673 individual files of e-mails and attachments. (Defs.' Mot. ¶ 7.)

{18} After acquiring the data, Scott prepared a document set using the search terms provided by Plaintiffs. The record indicates that Defendants did not review this document set for responsiveness, duplication, or privilege except for a limited effort to segregate communications with Defense counsel. Scott was instructed by Defense counsel to segregate all e-mails containing the extension "hickorylaw.com." (Defs.' Mot. ¶ 8.) The intent was to filter out any communications between HBI and members of the law firm of Young, Morphis, Bach & Taylor, LLP ("YMBT") in which defense litigation counsel Paul E. Culpepper ("Culpepper") and Kevin C. McIntosh practice. (Defs.' Mot. ¶ 8.)

{19} On January 3, 2012, Defendants produced a computer hard drive to Plaintiffs. Defendants did not index or keep a copy of the hard drive. Their indication in briefing and oral argument on the Motion of what was produced on January 3, 2012 is based on a later reconstruction of the document set gathered by Computer Ants. Defendants believe this initial hard drive contained more than 3.8 million documents and contained at least two libraries, one of which was the document set intended to segregate communications with YMBT. While the record remains somewhat unclear as to what the hard drive actually contained, Plaintiffs' presentation in connection with the Motion suggests that all communications from Defense counsel were, in fact, not altogether segregated into a separate distinct library by whatever procedure Computer Ants followed.

{20} Culpepper wrote a letter accompanying the January 3, 2012 production, which indicated his understanding that Computer Ants excluded "emails to or from the hickorylaw.com address[.]" (Defs.' Mot. Ex. B at 3 (emphasis in original).) Defendants contend that this letter then put Plaintiffs on notice that Defendants

did not intend to produce attorney-client communications, and that any such production was inadvertent. The same letter also admits that the contents of the hard drive were not reviewed prior to its production. (Defs.' Mot. Ex. B at 3.)

{21} Plaintiffs characterize the January 3, 2012 production as follows:

> [t]he attachments were separated from their parent emails with no way to connect other than to search for matching date and time stamps. The emails and attachments were also produced in a manner that did not provide any indication of the sender or receiver of the emails, or what portions of the production were responsive to which requests. In short, without a review of each email individually, it was not possible for Plaintiffs to glean any information from the production.

(Pls.' Resp. Br. 4.) Plaintiffs further indicate that the production was of limited use because, "Plaintiffs were able to search for words only if they appeared in the name of the file. The contents of the files were searchable only upon opening a file and running all search terms individually within the one file. This would have to be repeated for every file." (Aff. of Benjamin P. Fryer ¶¶ 5–9.)

{22} Plaintiffs demanded a further production, in part because Computer Ants had apparently failed to obtain e-mails from one HBI computer.

{23} Defendants on March 1, 2012 produced a second hard drive. As before, the hard drive was not indexed, no copy was retained by Defense counsel, and the hard drive was provided without any prior review by Defense counsel. The March 1, 2012 production apparently contained the same documents as the January 3, 2012 hard drive, plus new documents generated by using two additional search terms and searching the additional laptop.

{24} Plaintiffs first attempted to load the March 1, 2012 hard drive for indexing using a Microsoft X1 program. When this effort failed, Plaintiffs then separated the production into nineteen parts to be run on five separate computers. Plaintiffs indicate the process took four days, and that in the process, various copies of the original document production were made and may now reside on multiple computers, making it impossible as a practical matter for Plaintiffs to "return" the entire initial production as the Motion requests.

{25} On March 5, 2012, Plaintiffs served Defendants with a Rule 30(b)(6) deposition notice, which included as one topic Defendants' efforts to respond to discovery requests. (Defs.' Mot. Ex. C. at 4.) While Defendants complain that Plaintiffs' counsel learned of the possible inadvertent production of privileged information before the deposition was held and did not advise Defendants of this before the Rule 30(b)(6) deposition was taken, the record does not establish that Plaintiffs had any such suspicion when preparing the Rule 30(b)(6) notice of deposition.

{26} The law firm of Ellis & Winters, LLP was associated in or around early March 2012 to share representation with YMBT and represented HBI at the Rule 30(b)(6) deposition.

{27} Plaintiff's indexing efforts progressed such that Plaintiffs were able to begin their review of the production documents on March 14, 2012. During their initial review, Plaintiffs noted that the production included a large number of e-mails which had the caption of the lawsuit in the subject line. Plaintiffs indicate that they would have been required to open each e-mail individually to ascertain the sender or recipient of the e-mails, or to know the contents of any e-mail. Plaintiffs' counsel did not at that time undertake to advise Defense counsel of any issue as to the potential production of privileged communications. Plaintiffs also elected not review those documents. (Pls.' Resp. Br. 5−6.)

{28} Plaintiffs proceeded with HBI's 30(b)(6) deposition on March 16, 2012. Defense counsel were apparently not aware at this time of what had been produced on the January and March 2012 hard drives or that they may have included privileged communications. Plaintiffs' counsel conducted questioning on the noticed topic of the company's efforts to respond to Plaintiffs' discovery requests. HBI's President Joshua D. Higgins ("Higgins") testified as follows:

Mr. Nebrig:      Is the company aware of anyone reviewing the material that was placed on that hard drive before it was produced to Plaintiffs' counsel?

Mr. Higgins:      No.

| | |
|---|---|
| Mr. Nebrig: | Did the company instruct anyone to review what was on that hard drive before it was produced to Plaintiffs' counsel? |
| Mr. Higgins: | No. |

. . . .

| | |
|---|---|
| Mr. Nebrig: | So as far as the company is concerned, it would make sense not to review that information for relevancy; is that right? |
| Mr. Meyers: | Objection to form. |
| Mr. Higgins: | It would not make sense for the company to spend time going through the e-mails or any information that you've asked for. I mean, we've been -- it's more of an open book. I mean, you asked for something, and we're giving you the information you asked for. |

. . . .

| | |
|---|---|
| Mr. Nebrig: | The company made the decision not to review that material on the hard drive that was produced to Plaintiffs' counsel for privileged information; is that your testimony? |
| Mr. Meyers: | Objection to form. |
| Mr. Higgins: | It was the company's decision not to review it period. |

(Dep. of Joshua D. Higgins ("Higgins Dep.") 56:5–12; 58:8–17; 59:14–20.)

{29} At the conclusion of the Rule 30(b)(6) deposition, Plaintiffs' counsel informed Defense counsel that there were questions whether Defendants had produced attorney-client communications on the hard drives. The exact details of the conversation are unclear. During the conversation, Plaintiffs also complained about the breadth and content of the production.

{30} The Parties disagree as to what request, if any, Defense counsel made during this conference regarding Plaintiffs' continued review of the production. Defense counsel contends that Plaintiffs' counsel was requested to cease reviewing

the documents while the matter was investigated further. Plaintiffs' counsel contend that Defense counsel only committed to "look into" the issues with the production and made no specific request of Plaintiffs' counsel.

{31} It is clear that Defendants did not at that time identify specific privileged communications and did not itemize specific documents for return or segregation. It rather appears that Defendants would not at that time have been able to identify specific documents that had been produced for which any privilege should be claimed.

{32} Counsel discussed production issues in a telephone call on March 19, 2012. Both Parties admit the telephone call occurred, but they differ in their recollections of the conversation.

{33} Defense counsel contend that they explained that the document production "appeared to have included an inadvertent disclosure of privileged communications" and that Defendants were undertaking efforts "to correct all of the issues with the production at Defendants' expense." (Defs.' Mot. ¶ 22.) Defendants contend they requested in this conversation that Plaintiffs cease any review of the production pending those efforts.

{34} Plaintiffs' counsel recall that during the call, Defense counsel admitted that the March 1, 2012 production was an unacceptable discovery response, and that Defendants would then make a proper production. However, Plaintiffs contend that Defense counsel did not identify specific potentially privileged communications and did not request the return of the entire production. Plaintiffs' counsel deny that they agreed to cease reviewing the production; they contend to the contrary that they explicitly reserved the right to assert waiver and to move for sanctions. (Pls.' Resp. Br. 8.)

{35} Defense counsel as promised promptly undertook efforts to prepare a subsequent proper production. Several weeks later, Defendants made a production which they contend properly removed duplicate documents, made e-mails searchable along with their associated attachments, and limited the production to responsive material. Defendants later also produced a specific privilege log for the

documents withheld from the revised production and which they contend would include the privileged communications inadvertently produced in the prior productions.

{36} After these communications, Plaintiffs continued to review the initial production but implemented procedures intended to segregate the potentially privileged communications to prevent any review of them until the privilege issue was resolved. Plaintiffs' counsel represented at oral argument on the Motion that Plaintiffs had not as of that time opened or reviewed any attorney-client communications produced by Defendants.

{37} Defense counsel updated Plaintiffs' counsel as Defendants continued their efforts to make the subsequent production, including writing letters dated March 30, 2012 and April 4, 2012. The April 4, 2012 letter acknowledged problems with the prior production and characterized the prior effort by Computer Ants as "not very sophisticated" and having included no efforts to remove duplicates or limit production to only the designated search terms. In contrast, Defendants indicated that their revised approach "resulted in 1,410,838 total records, comprised of 1,145,147 e-mails and 342,516 e-mail attachments. The processing identified and removed nearly 2.3 million duplicate records." (Defs.' Mot. Ex. D at 2.) Defendants committed to review the revised production for privilege and to produce non-privileged documents in a searchable PDF format. (Defs.' Mot. Ex. D at 3.)

{38} The April 4, 2012 letter did not include a request that Plaintiffs return the original production or confirm any earlier request.

{39} Plaintiffs wrote Defendants on April 17, 2012, detailing continued discontent with the production and explaining that they "intended to continue [the review] process[ ]." The letter expressed the position that, "Defendants irrevocably waived any privilege that may have applied to [the produced documents] when they produced them without so much as a cursory review," and that, "[i]n light of Defendants' voluntary disclosure as well as their subsequent failure to assert privilege over any specific documents, [Plaintiffs] will treat all documents that

Defendants have produced as non-privileged and conduct [their] document review accordingly." (Defs.' Mot. Ex. E at 2.)

{40} Defendants responded by letter dated April 19, 2012, expressing the view that Plaintiffs "handling of the allegedly inadvertently produced privileged documents was improper and again request[ing] that [Plaintiffs] cease their review immediately and return the privileged documents immediately." (Defs.' Mot. ¶ 29.) Plaintiffs contend that the April 19, 2012 letter was Defendants' first request for the return of the production or of potentially privileged documents.

{41} Defendants advised Plaintiffs that Defendants would seek a court order requiring a return of the original productions if Plaintiffs did not voluntarily agree to their return by April 20, 2012. (Defs.' Mot. ¶ 29.) Defendants filed their Motion on April 23, 2012.

{42} The final revised production consisted of approximately 300,000 documents, in comparison to the 3.5 million documents on the January and March 2012 hard drives.

{43} Defendants' privilege log lists 511 documents, many of which are communications with counsel after the lawsuit was begun and which would appear to be subject to an attorney-client privilege if such privilege has not been waived.

{44} Defendants' Motion requests the return of the January 3, 2012 and March 1, 2012 hard drives and any copies made from them. The Motion asserts *inter alia* that: (1) Defendants employed reasonable measures to guard against the possible inadvertent disclosure of attorney-client privileged information; (2) upon discovering that privileged documents may have been inadvertently produced, Plaintiffs had an obligation under Rule 4.4 of the North Carolina Rules of Professional Conduct ("N.C. RPC") to promptly notify Defendants (Defs.' Mot. ¶ 20); (3) upon being informed by Defendants that the production of privileged information was inadvertent, Plaintiffs had an obligation under Rule 26(b)(7) to return, sequester, or destroy the inadvertently produced privileged documents (Defs.' Mot. ¶ 21); and (4) Plaintiffs' unilateral decision to treat the production as an intentional

waiver rather than an inadvertent disclosure is reprehensible conduct that should not be condoned or rewarded by the court.

{45} Plaintiffs respond that any waiver should be considered intentional rather than inadvertent because Defendants had purposely made a "document dump," and that it is the Defendants' conduct that the court should not condone. Alternatively, Plaintiffs contend that even if the production was inadvertent, any privilege has been waived.

### III. ANALYSIS

#### A. Attorney-Client Privilege and Waiver

{46} Generally, discovery matters fall within the trial court's discretion. *Hudson v. Hudson*, 34 N.C. App. 144, 145, 237 S.E.2d 479, 280, *disc. review denied*, 293 N.C. 589, 238 S.E.2d 264 (1977). The court approaches the exercise of discretion with caution when dealing with matters of privilege.

{47} A document may be protected from disclosure on the basis of attorney-client privilege upon a showing that: (1) the attorney-client relationship existed at the time the communication was made; (2) the communication was made in confidence; (3) the communication related to a matter about which the attorney is being professionally consulted; (4) the communication was made in the course of giving or seeking legal advice for a proper purpose although litigation need not be contemplated; and (5) the client has not waived privilege. *State v. Murvin*, 304 N.C. 523, 531, 284 S.E.2d 289, 294 (1981). Based on a review of the privilege log, without undertaking review of specific documents and making specific findings as to particular documents, the court assumes that the Defendants' production contained attorney-client privileged documents, so that the issue is one of waiver and not of whether the communications were privileged in the first instance.

{48} The attorney-client privilege can be waived by either intentional disclosure, *Industrotech Constructors, Inc. v. Duke Univ.*, 67 N.C. App. 741, 743, 314 S.E.2d 272, 274 (1984), or inadvertent disclosure. *See, e.g., Morris v. Scenera Research, LLC*, 2011 NCBC 33 (N.C. Super. Ct. Aug. 26, 2011), http://www.

ncbusinesscourt. net/opinions/2011_NCBC_33.pdf. In either case, a finding of waiver depends on the particular circumstances surrounding the disclosure.

{49} The record, including Mr. Higgins's testimony and the conscious choice to make the production without any advance review, might support a finding of an intentional waiver, although Defendants also contend that the effort to segregate communications with counsel, even if unsuccessful, demonstrate that any production of privileged communications was inadvertent. The court need not resolve these contested positions because it believes there has been a privilege waiver whether the production was intentional or inadvertent.

## B. Inadvertent Disclosure

{50} North Carolina case law addressing problems inherent in electronic discovery, including waiver arising from inadvertent disclosure of privileged information, is not yet well developed. Federal opinions are more extensive.

{51} This court recently examined the issue of inadvertent disclosure in *Morris v. Scenera Research, LLC.* There the court resolved the issues under federal law because they arose during the course of discovery while the case was pending in federal court prior to remand and discovery was governed by a discovery plan developed by federal discovery rules. The court's inquiry was aided by the fact that the parties there had entered a "claw-back" agreement. *See Morris*, 2011 NCBC 33 at ¶ 41.

{52} In *Morris*, this court followed a five-factor balancing test followed within the Fourth Circuit, which considers: (1) the reasonableness of the precautions taken to prevent inadvertent disclosure; (2) the number of inadvertent disclosures; (3) the extent of the disclosures; (4) any delay in measures taken to rectify the disclosures; and (5) the overriding interests of justice. *See Morris*, 2011 NCBC 33 at ¶ 45 (citing *Victor Stanley, Inc. v. Creative Pipe, Inc.*, 250 F.R.D. 251, 259 (D. Md. 2008)).

{53} The court believes that this balancing test developed by the federal courts provides an appropriate vehicle for the North Carolina state courts. However, on this record, the court also finds that the balancing test is controlled by

the first factor, and that the absence of reasonable precautions undertaken before the production of privileged communications prevents the court from using the other factors to protect against waiver.

### 1. Nature of Precautions Employed to Prevent Inadvertent Disclosure

{54}  One federal district court characterizes the need for advance efforts to protect against waiver as "paramount." *Martin v. State Farm Mut. Auto. Ins. Co.*, No. 3:10-CV-0144, 2011 U.S. Dist. LEXIS 36058 at *12 (S.D. W.Va. Apr. 1, 2011). Stated differently, to avoid finding a waiver, a court should be satisfied that reasonable efforts necessary to protect against potential inadvertent disclosure were undertaken.  Whether efforts were "reasonable" obviously depends on the particular circumstances that may vary from case to case.  Another federal district court expressed its view that generally the degree of those efforts should increase as the potential volume of documents to be produced increases.  *New Bank of New England v. Marine Midland Realty Corp.*, 138 F.R.D. 479, 483 (E.D. Va. 1991).  This court agrees.  Under this standard, the sheer volume of documents on the two hard drives produced by Defendants would suggest the need for more than minimal efforts to be taken prior to production to protect against the production of privileged communications.

{55}  The court acknowledges that the degree of efforts which could or should be undertaken to review for privilege prior to a production may vary based either on time exigencies or extraordinary expense.  Such issues can, for example, arise where expedited discovery demands the quick production of a large volume of information. Agreements such as "claw-back" and "quick peek" agreements often accompany such procedures.  Counsel suggests that the court should weigh the exigencies attendant to production required by the Stipulation immediately after the year-end holidays.  However, following that suggestion would require the court to ignore that the Stipulation resolved a motion to compel that was filed because the document requests had been outstanding and not responded to for several months.  By

comparison, the court notes a complete review of responsiveness, duplication and privilege was much more quickly completed after the issues arose in March 2012.

{56} Counsel also suggests that the court should approach the waiver issue with caution and recognizing that the general state court trial practice may not yet be as experienced in the particular problems attendant to electronic discovery as to justify a strict application of the waiver principles now developed in the federal courts. The court has exercised that caution, but that caution does not lead to protecting against a waiver on the facts of this case.

{57} The court also acknowledges that electronic discovery and the associated need to review for privilege can include extraordinary expense, such that a litigant may make a considered choice to relax efforts to avoid that expense. While such choices may be informed and reasonable ones, those choices must at the same time absorb the risk of a privilege waiver. Protections to guard against privilege cannot be deferred by first addressing the risk of waiver only after a production has been made.

{58} Defendants' efforts prior to production to guard against disclosure of privileged communication were limited, and included: (1) hiring Computer Ants as an outside consultant to copy, search, and produce relevant non-privileged e-mails and attachments; (2) instructing Computer Ants to identify documents responsive to a list of search terms; (3) instructing Computer Ants to remove all e-mails containing the extension "hickorylaw.com" from the documents produced; and (4) then producing the hard drives prepared by Computer Ants without any review or sampling or other quality assurance effort to assess whether the consultant's efforts had been successful in eliminating privileged communications. Defendants admit that they relied exclusively on "this contractor and this procedure" to filter out documents potentially subject to the attorney-client privilege. (Defs.' Mot. ¶ 8.)

{59} While Defendants assert that these limited procedures were reasonable "[g]iven the size of the production" at issue (Defs.' Br. in Supp. of Mot. for Order Compelling Return of Privileged Documents Supp. Br. ("Defs.' Supp. Br.") 4), the court concludes that the extent of Defendants' efforts to guard against potential

production of privileged communications  prior to producing the hard drives in January and March 2012 were not commensurate with the value of the privilege which Defendants now urge in their effort to protect against waiver.

{60}  Even though this court has earlier noted a clear caution that special care is required in approaching discovery of this type, *see Analog Devices, Inc. v. Michalski*, 2006 NCBC 14 (N.C. Super. Ct. Nov. 1, 2006), http://www.ncbusiness court.net/opinions/ 2006%20NCBC%2014.htm; *see also Bank of Am. Corp. v. SR Int'l Bus. Ins. Co., Ltd.*, 2006 NCBC 15 (N.C. Super. Ct. Nov. 1, 2006), http://www. ncbusinesscourt.net/ opinions/2006%20NCBC%2015.pdf., the court has not applied a bright-line rule which can be argued to now be the rule in the federal courts. Some federal district court decisions may stand for a simple and strict rule that a failure by Defense counsel to conduct any privilege review prior to production would preclude any argument that privileges had not been waived.  *E.g., In re Fountainebleau Las Vegas Contract Litig.*, No. 09-02106-MD-GOLD/GOODMAN, 2011 U.S. Dist. LEXIS 4105, at *37 (S.D. Fla. Jan. 7, 2011) (citing *Ciba-Geigy Corp. v. Sandoz Ltd.*, 916 F. Supp. 404, 412 (D.N.J. 1995); *United States Fid. & Guar. Co. v. Liberty Surplus Ins. Corp.*, 630 F. Supp 2d 1332 (M.D. Fla. 2007); *SEC v. Cassano*, 189 F.R.D. 83, 86 (S.D.N.Y. 1999).

{61}  The court has instead carefully considered whether waiver should not follow where Defense counsel sought the assistance of an outside consultant.  But, the court also concludes that efforts by a consultant demand a degree of oversight that is absent here.  In *Victor Stanley*, the United States District Court for the District of Maryland explained that parties must take special precautions when using an electronic search and retrieval methodology, like that employed by Defendants, to identify and withhold privileged materials, indicating that: (1) the "[s]election of the appropriate search and information retrieval technique requires careful advance planning by persons qualified to design effective search methodology"; (2) "[t]he implementation of the methodology selected should be tested for quality assurance"; and (3) "the party selecting the methodology must be prepared to explain the rationale for the method chosen to the court, demonstrate

that it is appropriate for the task, and show that it was properly implemented." *Victor Stanley*, 250 F.R.D. at 262. Defendants are not able to make such a showing on this record.

{62} Because the Defendants did not maintain copies of the hard drives produced to Plaintiffs, the record remains somewhat unclear as to how the documents on the two hard drives were organized. But it appears that whatever efforts Computer Ants followed did not isolate all privileged communications and the issue is not a simple one of just returning one library from the disks produced. Again, this court finds some guidance from the federal courts. In *Harmony Gold U.S.A. v. FASA Corp.*, 169 F.R.D. 113, 117 (N.D. Ill. 1996), the court indicated that it is "axiomatic that a screening procedure that fails to detect confidential documents that are actually listed as privileged is patently inadequate." Whether this court were to adopt such an axiom, here the Defendants' argument is compromised by a failure prior to production to undertake some minimal review of what was on the hard drive or to employ some minimal sampling of the libraries being produced to determine the effectiveness of procedures implemented to segregate privileged communications.

{63} The court also does not believe that counsel can altogether delegate the need to guard against production of privileged communications to an outside consultant. In *Thorncreek Apts. III, LLC v. Vill. of Park Forest*, 2011 U.S. Dist. LEXIS 88281, at *25–26 (N.D. Ill. Aug. 9, 2011), the court found reliance on a substantially more experienced electronic document consultant to be inadequate to protect against waiver where the party failed to conduct any testing of the consultant's work before production. The court explained that:

> it would have been a simple matter for the [producing party] to check the database . . . before it went live online and became available to the [receiving party] to verify that privileged documents were not disclosed. . . . Given the importance that parties typically attach to protecting even arguably privileged communications, one would have expected the [producing party] to perform such a verification check. The failure to do so is strong evidence of the inadequacy of [the producing party's] precautions.

*Id.* at \*25–\*26.

{64} Defendants' arguments are also compromised by Scott's testimony that he was given no guidance that would provide him any basis on which to determine whether or how documents on the production hard drive related to the case. (Scott Dep. 29:23–30:7.) Under those circumstances, it is more difficult to establish reliance on the expert as a reasonable advance precaution to guard against privilege waiver.

{65} This court takes no pleasure in finding the waiver of attorney-client privilege. But, regrettably, the court cannot on this record conclude that reasonable efforts adequate to protect against a waiver were undertaken in advance of production to insulate against a subsequent waiver by applying the remaining factors of the five-factor balancing test.

2. Other Factors of the Balancing Test

{66} As indicated above, the court concludes that the multi-factor balancing test applied by the federal courts on this record is controlled by the first factor which requires that reasonable advance efforts to guard against inadvertent production must have been taken.

{67} The second factor looks at the number of privileged communications that were inadvertently disclosed. The record indicates that the January 3, 2012 and March 1, 2012 hard drives contained approximately 1,700 documents to or from the "hickorylaw.com" domain name, some of which may have been removed as duplicates in the subsequent production and privilege log.

{68} Defendants cite *Sun River Energy, Inc. v. Nelson*, which included a comparison of "the number of inadvertent disclosures made in relation to the total number of documents produced." 2011 WL 3648600, at \*4 (D. Colo. Aug. 18, 2011). Defendants calculate that there was an inadvertent production rate of approximately 0.0045% calculated by an equation with a number of 1,700

potentially privileged documents and a denominator of a total production of 307,816,673 documents.

{69} Plaintiffs first argue that the failure to conduct any privilege review compels a finding of waiver without regard to any numerical inquiry. *See Ciba-Geigy Corp.*, 916 F. Supp. at 412. But, if any comparison is made, Plaintiffs contend the court should compare the number of privileged communications withheld from production to the number of inadvertent disclosures, and that such an equation does not aid Defendants who withheld no documents at all on the basis of privilege.

{70} The third factor examines the extent to which the privilege has been waived. Defendants conclude that "the extent of the disclosure, and any supposed prejudice to Plaintiffs, is insignificant." (Defendants' Reply Br. in Supp. of Mot. for Order Compelling Return of Privileged Documents 6.) Plaintiffs assert that the privilege issues pervade the entire production, asserting that the unsearchable format of the January 3, 2012 and March 1, 2012 productions forced Plaintiffs' counsel to index the documents, convert them into a searchable format, and load the documents again into a document review platform, with the result that, "hundreds of potentially privileged documents exist in multiple places that cannot be easily returned or destroyed," so that "Plaintiffs cannot effectively and comprehensively review Defendants' production without coming across potentially privileged documents." (Pls.' Resp. Br. 20.)

{71} If this third factor were controlling, the court would attempt to resolve the issues by fashioning a procedure that would guard against the use of privileged communications while not imposing an undue burden on Plaintiffs to search and return all copies made during the indexing process. But, again, the court concludes that the controlling factor is the absence of efforts on the front end. Here, the court cannot conclude that the inadvertent production has been "insignificant."

{72} The fourth factor inquires as to the reasonableness of the producing party's response when learning of inadvertent production. Defendants cite *Ceglia v. Zuckerberg* for the notion that "with regard to reasonableness of steps to rectify the inadvertent disclosure, the delay in seeking to remedy the inadvertent disclosure of

privileged material is measured from the date the holder of the privilege discovers the . . . disclosure[,]" No. 10-CV-00569A(F), 2012 WL 1392965, at *9 (W.D.N.Y. Apr. 19, 2012), and assert that Defendants acted "immediately upon the learning of the inadvertent disclosures [on March 16, 2012] to rectify the situation." (Defs.' Supp. Br. 5.) Plaintiffs, in turn, suggest that the delays in a written demand for the return of privilege documents militates against excusing a waiver, and particularly so where the ultimate request was not for the return of only specific privileged documents but rather for the return of the entire production.

{73} The court need not accept any invitation to criticize the timeliness of Defendants' response once learning that privileged communications had been produced, and the court in no way bases its finding of waiver on acts or omissions in and after March 2012.

{74} The final factor is an imprecise one which inquires into "the overriding interests of justice." The court leaves for another day exactly what may be captured by this factor, but notes that the term "overriding" suggests that something extraordinary is required to insulate against a finding of waiver when the first four factors suggest the contrary.

{75} Defendants urge that here the court should rely on that factor because a failure to do so would improperly condone Plaintiffs' failure to satisfy their obligations under Rule 26(b)(7)(b) and N.C. RPC 4.4(b). Plaintiffs counter that the court should rather be careful not to condone Defendants' "document dump" and their effort to "shift the cost of reviewing this document dump to Plaintiffs." (Pls.' Resp. Br. 21.)

{76} Certainly, the court does not intend to condone one party "sandbagging" the other by taking advantage of surprise and using privileged information to take unfair advantage in a witness examination. But, here the court does not find that the record quite as clearly raises the ethical concerns Defendants urge. This is not a case of where Plaintiffs surprised a defense witness by producing a privileged communication or using a privileged communication to formulate substantive inquiries. The record instead suggests that Plaintiffs segregated and did not read

communications which they identified as potentially privileged. The witness examination at issue was limited to the topic, specifically identified in a prior Rule 30(b)(6) deposition notice, of what efforts Defendants had undertaken in producing the documents.

{77} Rule 26(b)(7)(b) provides that an attorney who inadvertently receives privileged documents:

> (i) must promptly return, sequester, or destroy the specified information and any copies it has, (ii) must not use or disclose the information until the claim is resolved, (iii) must take reasonable steps to retrieve the information if the party disclosed it before being notified, and (iv) may promptly present the information to the court under seal for determination of the claim.

N.C. R. Civ. P. 26(b)(7)(b) (2011). Here, while Plaintiffs asserted the right to continue review because of their conclusion that the waiver was intentional, the record also indicates that Plaintiffs segregated the communications and avoided their review. In its ruling, the court does not and does not intend to encourage a receiving party to believe that it has the unilateral right to determine whether the producing party had intentionally waived privileges when producing attorney client communications.

{78} Defendants separately invoke the provisions of N.C. RPC 4.4(b) which provides that, "[a] lawyer who receives a writing relating to the representation of the lawyer's client and knows or reasonably should know that the writing was inadvertently sent shall promptly notify the sender." N.C. RPC 4.4(b) (2005).

{79} Defendants' argument raises at least two questions. First, the court must inquire whether it, rather than the State Bar, is the proper entity to police a violation of the ethical rule. The court need not resolve that issue here, but its clear inclination would be that in the proper case, a violation of an ethical duty may be captured in the exercise of the fifth factor of the balancing test. The second question is whether the record clearly demonstrates that Plaintiff's notice of the issue of potential waiver was "prompt" within the meaning of the rule. This is an imprecise question for which there is no bright-line for determination. Again, the

court here notes the contrast between the facts of this case and an instance in which a party attempts by surprise to use the contents of a privileged communication. Here, Plaintiffs examined Defendants' witness on a topic notice in the Rule 30(b)(6) notice of deposition and did so without using the contents of any privileged communication. The court concludes that those facts are not adequate to insulate against the waiver that results from the failure to take reasonable protections in advance of producing the privileged communications.

{80} Again, the court does not by its ruling intend to encourage any party receiving what may appear to be privileged communications to elect to provide no notice to opposing counsel because the receiving counsel unilaterally concludes that the waiver was intentional rather than inadvertent.

## IV. CONCLUSION

{81} The court believes that the facts of this case are unusual, and that the court's ruling must be considered in light of this particular record. The court recognizes that "[t]he public's interest in protecting the attorney-client privilege is no trivial consideration[.]" *In re Miller*, 357 N.C. at 328, 584 S.E.2d at 782. But, those considerations also require some minimal level of effort to guard against waiver prior to document production. Here, considering all factors, the court must conclude that any attorney-client privilege attendant to the produced documents has been waived.

{82} Accordingly, Defendants' Motion is DENIED.

IT IS SO ORDERED, this 26th day of July, 2012.